# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-62390-BLOOM/Valle

UNION THEODORE BETHELL,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court following a bench trial held over the course of three days from November 29, 2016 to December 1, 2016. ECF Nos. [130], [133], [134]. Pursuant to this Court's order, ECF No. [34], the parties submitted proposed findings of fact and conclusions of law within thirty days of the filing of the trial transcripts. *See* ECF No. [149] ("Defendant's Proposed Findings"), ECF No. [151] ("Plaintiff's Proposed Findings"). The Court has carefully considered the evidence presented at trial, the applicable law, and the parties' submissions, and sets forth its relevant findings of fact and conclusions of law below.

    **I.    INTRODUCTION**

This case arises from life altering injuries sustained by Plaintiff Union Theodore Bethell ("Bethell, Jr." or "Plaintiff") during a rescue conducted by the United States Coast Guard ("Coast Guard") on the evening of March 13, 2015. Plaintiff asserts that Defendant United States of America ("Defendant"), acting through the United States Coast Guard ("Coast Guard"), was negligent in conducting his rescue from the F/V *Joyce Lynn II* ("*Joyce Lynn*").

Plaintiff maintains that the Coast Guard was negligent because their actions put him in a more dangerous position than if they had done nothing, that the Coast Guard failed to exercise due care during the course of the rescue in their communications, and was negligent in the manner in which they performed the direct personnel transfer. Defendant maintains that Plaintiff has failed to show sufficient evidence to support a finding of negligence on the part of the Coast Guard crew, or that their conduct increased the risk of harm to Plaintiff. The determination of negligence focuses on events that transpired over a short period of time during the direct transfer of Bethell, Jr. from the *Joyce Lynn* to the Coast Guard boat.

## II. FINDINGS OF FACT

### A. Grounding of the *Joyce Lynn*

Bethell, Jr. was a commercial fisherman working aboard the *Joyce Lynn* with three other crew members – his father, Captain Union Norman Bethell ("Captain Bethell"); Christopher David Morales ("Morales"); and Sam Koury ("Koury"). Captain Bethell is an experienced fisherman and boat captain, having fished his whole life. On the night of March 13, 2015, the *Joyce Lynn*, a sixty-three (63) foot fishing vessel, was returning to port with a catch of golden crabs following a three- (3) day voyage at sea. The crewmembers rotated watch during the approximately twelve- (12) hour voyage back to Port Everglades. Koury was at the helm of the boat, while Plaintiff, Captain Bethell, and Morales slept below the deck. The crew members awoke to shouting from Koury and the sensation that the boat was grinding against something. The *Joyce Lynn* crew quickly realized that the boat had run aground. In fact, the *Joyce Lynn* ran aground on a shoal north of the Port Everglades inlet. The National Weather Service forecasted conditions in the area were winds out of the east/southeast at fifteen (15) to twenty (20) knots, with seas of four (4) to six (6) feet with occasional eight- (8) foot seas.

### B. Mayday Call and Coast Guard Response

Shortly after the grounding, Captain Bethell called in a "Mayday" over radio channel 16 to the Coast Guard, stating that they were breaking up on the shoal. Mayday is a distress call broadcast over frequency 16 to indicate a vessel or person in distress. In response to the Coast Guard's questions over the radio, Captain Bethell stated that there were four persons on board who were putting on their life vests, and that they needed someone to get there as soon as possible as they just needed to get off the shoal. A Coast Guard small vessel SPC-LE 33126 (the "33"), which was already on patrol in the Port Everglades inlet, then responded to the Mayday call. The crew aboard the 33 included Petty Officer Humberto Diaz, the coxswain ("Diaz"), Petty Officer Jared Tidwell ("Tidwell"), Petty Officer (then Seaman) Kevin Friedlander ("Friedlander"), and Petty Officer Ethan Castelow ("Castelow"). That night, the other boat available at the Coast Guard station was a 45-foot medium response boat (the "45"), which was dispatched from the station and responded approximately twenty-three (23) minutes after the 33.

The area where the *Joyce Lynn* ran aground is subject to strong currents and often greater-than-forecasted seas because of the jetties to the north and south of the Port Everglades Inlet, as well as other submerged features. The seas in the area are often described as akin to a "washing machine" because of the confluence of currents. As reported by the 33 in radio transmissions to Coast Guard station Fort Lauderdale, sea conditions were relatively rough, with winds from the east at fifteen (15) to twenty (20) knots and five- (5) to six- (6) foot seas. Upon the 33's arrival on scene, the Coast Guard observed the *Joyce Lynn* aground on the shoal, bow pointing toward the shore, and listing to the port side. The high-water bilge alarm was sounding, indicating that the *Joyce Lynn* was taking on water, and water washed over the stern of the *Joyce Lynn*, sufficient to shift loose gear about the deck. There was debris in the surrounding water.

Morales was attempting to cut the *Joyce Lynn*'s life raft from the top of the pilot house, and all four crew members were on deck wearing their life jackets. The *Joyce Lynn* crew members were shouting and moving about the deck in a disorganized and frenetic fashion. Diaz described the *Joyce Lynn* crew as scared, tense, agitated, and ready to get off the boat. They suggested throwing lines to the Coast Guard or even jumping in the water.

### C. The Rescue Plan

Based upon his observations, Diaz determined that the *Joyce Lynn* crew members needed to get off their boat, and that the 33 should effectuate a direct transfer of the *Joyce Lynn* crew members from their vessel to the 33. The 33 crew determined that the potential risk associated with other rescue methods, including having the *Joyce Lynn* crew members jump in the water, outweighed the risk associated with direct transfer. This was due to several factors that included debris in the water, the darkness, the possibility of the *Joyce Lynn* rolling or capsizing, and the perceived mental state of the *Joyce Lynn* crew. The 33 crew also determined that the transfer should take place between the stern of the *Joyce Lynn* and the bow of the 33. This was due to the starboard side of the *Joyce Lynn* being obstructed by metal fishing gear that could damage the 33, injure personnel, and make it difficult for the *Joyce Lynn* to transfer in the prevailing conditions.

Accordingly, as the coxswain and individual in overall command, Diaz posted the other 33 crew members. Diaz delegated responsibilities to each as part of the rescue effort to direct transfer the *Joyce Lynn* crew. Diaz took the helm of the 33 and coordinated the rescue. Friedlander was posted on the bow of the 33 closest to the *Joyce Lynn* in order to communicate with the *Joyce Lynn* crew and assist them in transferring. Tidwell was assigned to assist Friedlander in transferring the *Joyce Lynn* crew and ensure they were secured once aboard the

33, namely by directing each transferred *Joyce Lynn* crew member through the 33 cuddy cabin door. Castelow was posted at the stern of the 33 to monitor and call out wave sets. The overall plan consisted of transferring each *Joyce Lynn* crew member from the stern of the *Joyce Lynn* to the bow of the 33 one at a time. Prior to undertaking the transfer, Diaz communicated with the Command Duty Officer to brief him on the rescue plan. Following Diaz's briefing, the Duty Officer deferred to Diaz's assessment of the situation and best method of rescue.

Diaz testified that he communicated the rescue and transfer plan to the crew of the *Joyce Lynn*, telling them to "go" when ordered, or to "stand by." Seated at the helm of the 33, Diaz issued the commands through an open sliding door next to his seat, timing the commands to transfer with the movement of the sea swells, which would bring the bow of the 33 together with the stern of the *Joyce Lynn*.

### D. The Morales Video and the Direct Transfer

After the *Joyce Lynn* ran aground during Koury's shift, and the sleeping crew went to the deck, Morales took with him his cell phone and began to record video and audio to document the events. This was in order to later show the video to the *Joyce Lynn*'s owner, Howard Rau, as a reason for him to terminate Koury. The video, Defendant's Exhibit D, was shown multiple times during the trial and depicts the approximately eight (8) minutes it took for the 33 to respond to the scene and the moments before Bethell was transferred.

The beginning of the video reveals at least three of the *Joyce Lynn* crew members standing on the bow of the vessel talking to each other as they await the arrival of the 33. Morales appears to be reassuring Bethell, Jr. that they will be fine, while Bethell, Jr. comments,

5

"I know, I ain't taking no chances. I've been close before." [0:42-0:45].[1] A few moments later, Captain Bethell can be heard to say, "if a big wave hits, we might roll." [1:15-1:18]. Bethell, Jr. asks if they should be closer to the bow so that they can get away. [1:22-1:24]. The chirping of the high-water bilge alarm can be heard in the background. Morales suggests that they go to the stern of the boat. [1:31-1:34]. The arriving 33 crew then shouts out to speak to Captain Bethell, as Morales makes his way to the stern of the boat. [1:37-2:00]. At this point, the video captures wave water washing over the open stern of the *Joyce Lynn*, and boxes and other items awash on deck as the 33 makes its approach. [2:00-2:35]. A stacked cooler is knocked down against Bethell, Jr., and he shouts out to his father, Captain Bethell, to "get up here!" [2:43-2:48]. Morales then moves, with the cell phone videotaping, toward a crate in order to grab a knife so that he can cut down the life boat from the top of the pilot house. [2:50-3:05]. The video captures Bethell, Jr. and Captain Bethell both wearing life vests. [2:55]. Moments later, Morales places the cell phone in a plastic bag to protect it from the water. [3:27]. The high-water bilge alarm continues to sound throughout the captured footage.

After Morales places the camera in the bag, the audio is more difficult to hear, but the Court discerns the following relevant facts from review of the footage and consideration of the testimony at trial. As the 33 makes its approach, Tidwell says over the loud hailer to the *Joyce Lynn* crew, "don't jump in the water, we're going to come alongside." [6:47-6:49] According to Bethell, Jr., when he and his fellow crew members were lining up and readying to transfer to the 33, he was anxious, apprehensive, and had a bad feeling. He also testified that he did not want to jump; however, none of the *Joyce Lynn* crew members protested or otherwise questioned the Coast Guard's plan or command to direct transfer.

---

[1] The bracketed times refer to the relevant time signature within Defendant's Exhibit D during which the comments or events occurred.

Morales was the first person to transfer from the *Joyce Lynn* to the 33.[2] On the video, he is told to watch the rope across the transom of the *Joyce Lynn*, so as not to trip and fall. [6:58]. Diaz says, "alright, go now. Alright, got one," indicating that Morales has transferred successfully onto the 33. [6:59-7:02]. Morales is then directed once aboard the 33 with, "this way this way this way." [7:03-7:04]. Tidwell tells Morales to "go go go" into the cuddy cabin [7:18-7:21], while Diaz tells Koury, who is still on the *Joyce Lynn*, to "stand by stand by stand by," [7:18-7:20].

Diaz next says, "Friedlander, watch out" [7:22-7:23], followed by "get on get on" to Koury, and "get him on, get him on" [7:23-7:26]. As Koury transfers onto the 33, the video captures Morales settling into the cuddy cabin. Diaz then says, "alright, let's go, let's go" [7:27-7:28], followed immediately by "stand by" to Bethell, Jr., [7:29]. Next on the video, Morales says, "thank you sir," as he takes his seat in the interior of the 33 next to the pilot seat where Diaz is driving [7:31]. The video then captures Koury's leg entering the cuddy cabin [7:33-34], and Tidwell telling him to "go, go, go" so that Tidwell can close the cuddy cabin door. [7:34-7:35]. At almost the same instant, Diaz directs Bethell, Jr., the third crew member to transfer from the *Joyce Lynn*, to "stand by stand by stand by." [7:35-7:36]. Castelow was not on the stern of the 33 when Bethell, Jr. jumped. At some point before Bethell, Jr.'s transfer to the 33, Castelow left his post on the stern calling out wave sets to Diaz, and entered the 33 cabin.

Plaintiff watched Morales and Koury transfer from the *Joyce Lynn* to the 33, and when it was his turn, Plaintiff remembers a Coast Guard member standing directly in front of him, telling him to "go, go, go." The testimony established that Friedlander was the Coast Guard member positioned closest to the stern of the *Joyce Lynn*, and the Coast Guard member tasked with

---

[2] After Morales transferred from the *Joyce Lynn* to the 33, he entered the cuddy cabin, and the remainder of the video recording captures relevant audio from inside the 33.

7

helping the crew members of the *Joyce Lynn* transfer onto the 33. However, Friedlander testified that he did not give Plaintiff a command to transfer, and in fact had his hand up in front of Plaintiff to signal Plaintiff to stand by. Upon hearing the "go, go, go," which Tidwell said to Koury (and previously, to Morales) in directing Koury into the cuddy cabin, Bethell, Jr. jumped. Bethell, Sr. testified that he also heard the "go, go, go" command, and when he looked, he saw Plaintiff had left the transom of the *Joyce Lynn*. In midair, Bethell, Jr. looked down and realized that the gap between the boats was widening. When his right foot hit the rounded gunwale of the 33 bow, Bethell, Jr. slipped and fell into the gap between the boats. On the video, as Koury is being directed to "take a seat right here," Diaz shouts, "pull on!" [7:37-7:38]. The audio captures Diaz shouting "get him on! Get him on! Get him on!" [7:40-7:42], referring to Bethell, Jr.. The video and audio recording then abruptly ends.

When Bethell, Jr. fell between the *Joyce Lynn* and the 33, Friedlander was able to grab him, and pull him partially aboard the 33. Bethell, Jr. was facing up, with his pelvic region on the metal strip at the top of the starboard gunwale of the 33, with his legs still off the boat. At that moment, wave action brought the stern of the *Joyce Lynn*, which was higher than the bow of the 33, down on top of Bethell, Jr., crushing his pelvic area between the vessels. Thereafter, with Tidwell's help, Friedlander pulled Bethell, Jr., who was seriously injured, fully aboard the 33. In response to the seriousness of Plaintiff's injuries, Bethell, Sr. entreated the Coast Guard to leave him aboard the *Joyce Lynn* and get Plaintiff to emergency medical care. The Coast Guard left Bethell, Sr. aboard the *Joyce Lynn* to await the arrival of the 45. Several minutes later, the *Joyce Lynn* washed ashore on Fort Lauderdale Beach, where Bethell, Sr. was able to get off uninjured. By the time the 45 arrived, the *Joyce Lynn* was on shore. The total amount of time that elapsed

between the initial Mayday call and the 33 mooring at the Coast Guard station to get Bethell, Jr. emergency medical treatment was twenty-one (21) minutes.

### III. CONCLUSIONS OF LAW

The Public Vessels Act, 46 U.S.C. §§ 31101, *et seq*. ("PVA") constitutes a waiver of sovereign immunity by the United States for "damages caused by a public vessel of the United States." 46 U.S.C. § 31102(a)(1). The PVA encompasses alleged injuries caused by the "negligence of the personnel of a public vessel *in the operation of* the vessel [that] causes damage to other ships, their cargoes, and personnel. *Uralde v. United States*, 614 F.3d 1282, 1285 (11th Cir. 2010) (emphasis in original) (internal quotations omitted). The Suits In Admiralty Act, 46 U.S.C. §§ 30901, *et seq*. ("SIAA") also constitutes a waiver of sovereign immunity "[i]n a case in which, if a vessel were privately owned or operated . . . or if a private person were involved, a civil action in admiralty could be maintained." 46 U.S.C. § 30903. Claims under the PVA are limited to those in which the alleged damage is caused directly by the public vessel or in the operation of the vessel, while the SIAA covers all remaining admiralty claims involving public vessels. *Uralde*, 614 F.3d 1282, 1287. "Accordingly, when Coast Guard personnel are negligent in performing functions other than those 'in the operation of' public vessels, the claims arising from those acts fall under the SIAA, rather than the PVA." *Id*. Although there is no definition of what is included in the "operation of" public vessels, it seems clear that any negligent communications and the negligence of the crew in the rescue efforts do not implicate the operation of the 33 in this case. *See e.g., Borges v. United States*, 652 F. App'x 824, 826 (11th Cir. 2016) (alleged negligence of the Coast Guard in waiting two days to evacuate a passenger on an intercepted boat for medical care arose under the SIAA). Thus, even though Bethell Jr.'s injuries were ultimately caused by the collision of the *Joyce Lynn* and the 33,

Plaintiff's claims involve the SIAA, because they do not stem from the Coast Guard crew's operation of the 33.

Pursuant to 14 U.S.C. § 88, the Coast Guard "may render aid to persons and protect and save property at any time and at any place at which Coast Guard facilities and personnel are available and can be effectively utilized." 14 U.S.C. § 88(b)(1). The Coast Guard, "in order to render aid to distressed persons, vessels, and aircraft," is further empowered to "perform any and all acts necessary to rescue and aid persons and protect and save property." 14 U.S.C. § 88 (a). However, "[i]t is well-settled that the Coast Guard's authority to provide such assistance is purely voluntary and permissive." *DFDS Seacruises (Bahamas) Ltd. v. United States*, 676 F. Supp. 1193, 1200 (S.D. Fla. 1987); *see also United States v. DeVane*, 306 F.2d 182, 186 (5th Cir. 1962). Therefore, the Coast Guard has no affirmative duty to rescue. *DFDS Seacruises*, 676 F. Supp. at 1200. Nevertheless, once the Coast Guard undertakes to perform a rescue, it has an obligation to use reasonable care in carrying out the rescue. *Devane*, 306 F.2d at 186. The parties agree that the applicable standard is articulated in the Good Samaritan Rule, pursuant to which liability is imposed if the "would-be rescuer was negligent under the circumstances *and* his conduct worsened the position" of those in distress.[3] *DFDS Seacruises*, 676 F. Supp. at 1201 (emphasis in original). In reviewing the Coast Guard's conduct and whether it worsened Bethell, Jr.'s position, the Court must evaluate the Coast Guard's actions in light of the information known during the rescue, and not with the benefit of hindsight. *Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 262 (1st Cir. 2003). "Accordingly, conduct that might ordinarily be negligent, may be non-negligent in the pressure cooker circumstances of a rescue." *Id.*

---

[3] Plaintiff concedes that the Coast Guard is protected from liability regarding the decision to rescue, ECF No. [151] at 28, which is consistent with this Court's order on Plaintiff's motion for summary judgment. *See* ECF No. [75].

(quoting *Fondow v. United States*, 112 F. Supp. 2d 119, 131 (D. Mass. 2000)) (internal quotations omitted).

## IV. ANALYSIS

Plaintiff contended at trial that Defendant should be liable for his injuries because the Coast Guard told him to jump at the wrong time; the Coast Guard unreasonably selected the location on the *Joyce Lynn* from which to perform the direct transfer; the Coast Guard should have aborted the rescue attempt before Plaintiff was injured when they realized the problems with maintaining station; the Coast Guard should have continued to monitor or evaluate the circumstances and institute a change of plans once the plan to direct transfer was decided upon; and the 33 was operating beyond its capabilities and should have considered other options, such as waiting for the larger Coast Guard 45 vessel to arrive on scene.

### A. The Command to Transfer

Plaintiff's main contention at trial was that the Coast Guard's failure to clearly establish the commands to be given to effectuate the transfer of the *Joyce Lynn* crew members, and the ensuing confusion evidenced by Bethell, Jr.'s mistimed jump, was negligent. According to Plaintiff's reasoning, once Diaz decided that the "go" command would signify the time to transfer and "stand-by" would signal a jumper to wait, it was negligent for any other Coast Guard to use the word "go" to mean anything other than jump. The Court cannot agree.

While the Coast Guard Boat Crew Seamanship Manual COMDTINST M16114.5C (the "Manual") specifies that "[t]he coxswain shall [u]se standard terminology in giving commands to the crew and in conducting external communications," Plaintiff failed to present evidence of how his own confusion about to whom the command was being given equates to a violation of this stated policy, especially given the circumstances present in this case. The evidence presented at

trial demonstrates that the "go, go, go" command that Plaintiff heard was said by Tidwell to urge Koury into the cuddy cabin. This command was given so Tidwell could close the door in preparation to receive Bethell, Jr. aboard the 33 once Diaz gave the command to transfer. This "go, go, go" by Tidwell was the same command given to Morales before Koury transferred. Furthermore, Plaintiff apparently understood the first command from Diaz to "stand-by". Almost simultaneously to Tidwell's command of "go, go, go" to Koury, directing him down into the cuddy cabin, Diaz shouted "stand-by, stand-by, stand-by" again to Plaintiff, as the 33 was not ready to receive him aboard. The evidence establishes that the first two crew members, Morales and Koury, were able to transfer successfully from the *Joyce Lynn* to the 33 prior to Bethell, Jr. This was despite the "go" command that was used by Tidwell to Morales to "go, go" into the cuddy cabin, prior to Koury's transfer, and the command by Diaz when he said "alright let's go, let's go" prior to Bethell, Jr.'s transfer—upon which Bethell, Jr. did not jump.

### B. Risk Reassessment and the Transfer Location

Plaintiff did not present sufficient evidence to support the finding that the Coast Guard crew should have reassessed the rescue situation, once they had determined the plan to direct transfer. Nor does the Court find that it would have been reasonable to do so, given the nature of the situation. As a threshold matter, the assessment or reassessment of risk relates more to the decision to rescue, rather than the manner in which the actual transfer was carried out. Nevertheless, the evidence at trial demonstrated that the Coast Guard crew undertook the required risk assessment review and determined an appropriate Gather Assessment Responsibility ("GAR") score. Furthermore, Diaz had spoken to the Command Duty Officer, who ultimately deferred to Diaz's assessment. As depicted by the video, the rescue sequence from the time Tidwell told the *Joyce Lynn* crew not to jump in the water becuase the 33 would

come alongside, until Bethell, Jr.'s injury was approximately one (1) minute. The events over the course of the rescue occurred in very quick succession, and an additional delay could have placed the *Joyce Lynn* crew in more danger.

Moreover, the Court determines that the location chosen by the Coast Guard in which to effectuate the transfer—from the stern of the *Joyce Lynn* to the bow of the 33—was reasonable, given that the starboard side of the *Joyce* Lynn was obstructed by metal fishing gear, and the risk of damage or injury from the starboard side was higher. Furthermore, the evidence reflects that the *Joyce Lynn* was listing to its port side.

### C. Maintaining Station

Plaintiff presented evidence that Castelow, the Coast Guard crew member tasked with calling out wave sets to Diaz during the rescue, left his post before Plaintiff's transfer. Therefore, Plaintiff suggests, Diaz was unable to adequately maintain station at the stern of the *Joyce Lynn* in order to adequately time the commands to jump. However, there was no testimony that Diaz relied exclusively, or even principally, upon Castelow's calling out wave sets in order to be able to adequately time the commands to transfer. Although Diaz testified that the conditions were rough and Castelow was helpful, Diaz testified further that he became familiar with the wave sets, and was able to maintain station and properly time the swells. The evidence established that Diaz had conducted a vessel-to-vessel transfer in similar conditions during one of his previous postings in the Coast Guard, and had over one thousand (1,000) total boat hours as a qualified coxswain.

### D. The 33's Operational Limitations

The evidence does not support the finding that the 33 exceeded its operational capabilities on the evening that the incident occurred, such that it was unreasonable for the Coast

Guard to undertake the rescue before the 45 arrived. Despite the Coast Guard crew's subsequent statements that there was "breaking surf" or similar language, the 33 did not exceed its operational capabilities under the Coast Guard definition of "surf," in the absence of evidence to the contrary regarding the judgment of the commanding officer or officer in charge, or that there was any doubt in Diaz's mind regarding the conditions.[4] In fact, Diaz testified that the conditions he observed were not "breaking surf" as defined by the Coast Guard. Surf conditions did not exist based upon the prevailing reported winds from the east at fifteen (15) to twenty (20) knots and five- (5) to six- (6) foot seas in the area where the *Joyce Lynn* ran aground. In making this determination, the Court finds the testimony of Plaintiff's expert, Marjorie Clarke, to be unpersuasive based upon her narrow review of record materials. Specifically, Ms. Clarke based her opinion that the 33 exceeded its operational capabilities primarily upon the Florida Fish and Wildlife's reporting of on-scene conditions with waves between seven (7) and (9) feet, the Coast Guard statements using the term "surf," and the Coast Guard's own incident investigation, which noted that the area is typically subject to strong currents and greater than forecasted seas due to the influences of the inlet and manmade jetties.[5]

In contrast, Defendant's expert, Jeffrey Wheeler, in opining that the 33 did not exceed its operational parameters, relied primarily upon the National Oceanic and Atmospheric Administration's weather forecast and the video taken by Morales reflecting the actual conditions present, which he studied in conjunction with the specifications of the draft and

---

[4] "In the Coast Guard, surf is determined to exist when breaking seas exceed 8 feet and/or when, in the judgment of the CO/OICS, rough bar/surf conditions exist, and/or whenever there is doubt in the mind of the coxswain as to the present conditions." Boat Crew Seamanship Manual (COMDTINST M16114.5C), Appendix A. (Defendant's Exhibit S).

[5] Additionally, the parties stipulated that the conditions, as forecasted by the National Weather Service, included winds out of the east/southeast at 15-20 knots, seas 4-6 feet with occasional 8 foot seas and a small craft advisory. ECF No. [76] V.¶5.

gunnel height of the *Joyce Lynn*. The Court, therefore, finds Mr. Wheeler's conclusion more persuasive. The video taken by Morales shows conclusively that while the seas were rough in the minutes leading up to Plaintiff's rescue, the waves were not in excess of eight (8) feet. Moreover, the conditions reported by the 33 crew, who were on scene, to Coast Guard station Fort Lauderdale—winds from the east at fifteen (15) to twenty (20) knots and five- (5) to six- (6) foot seas—further support the determination that the 33 was operating within its limits.

### E. Worsened Condition or Increased Risk of Harm

Additionally, the Court finds that the Coast Guard's actions did not worsen the situation or increase the risk of harm to Bethell, Jr. In support of his argument, Plaintiff relies upon the fact that minutes after Bethell, Jr.'s injury, the *Joyce Lynn* washed ashore, where Captain Bethell was able to jump safely onto the beach without incident. Therefore, had the Coast Guard not rescued the *Joyce Lynn* crew, Plaintiff reasons that he would have simply jumped off the boat unharmed once the *Joyce Lynn* washed ashore, as Bethell, Sr. was able to do. However, in making this determination, the Court would be required to use hindsight in its analysis, which it cannot do. "[T]he Court should not second-guess difficult decisions made by rescue personnel in the midst of an emergency." *DFDS Seacruises*, 676 F. Supp. at 1201; *see also Fondow*, 112 F. Supp. 2d at 132 ("The Court must consider the Coast Guard's actions and decisions in the dawn light of the information known during the rescue and not under the bright light cast by nearly four years of hindsight.").

Based upon the information available to the 33 at the time, the Court finds that the Coast Guard crew's actions in rescuing the *Joyce Lynn* crew did not worsen Bethell, Jr.'s situation or increase the harm to him. The 33 responded to a Mayday call—indicating a vessel in distress—initiated by Captain Bethell, who communicated an urgency and need to get off the shoal, and

the belief that they were "breaking up on the shoal." Upon arriving on scene in rough seas and strong winds, the 33 found the *Joyce Lynn* run aground on a shoal, listing to the port side, high-water bilge alarm sounding. The Coast Guard members were able to observe four crew members aboard wearing life jackets and moving about the deck in a disorganized fashion, avoiding gear awash on deck due to the wave action. In addition, at least one crew member was attempting to cut down the life raft from the top of the pilot house. Under the circumstances, it was necessary for the Coast Guard to act quickly based in no small part upon the exigency created by the *Joyce Lynn* crew's own behavior.

Contrary to their assertions, the crew's behavior at the time did not convey calm or confidence that they would be safe on board until the *Joyce Lynn* eventually washed ashore. Moreover, just as easily as the *Joyce Lynn* drifted to shore after the Plaintiff was injured, the *Joyce Lynn* could conceivably have rolled or even sunk given the sea state at the time, or the *Joyce Lynn* crew could have been injured on an observably unsafe vessel. The possibilities are numerous under the circumstances, which is why the Court will not now judge the Coast Guard's actions upon the subsequent and fortunate fact that the *Joyce Lynn* drifted ashore with no injuries to Captain Bethell, the only remaining crew member on board.

Therefore, it is the Court's conclusion that Plaintiff's injuries were an unfortunate and tragic accident. However, the evidence presented at trial fails to establish, by a preponderance of the evidence, that Defendant, through the actions of the Coast Guard crew of the 33, was negligent in conducting Plaintiff's rescue.

## V. CONCLUSION

For the foregoing reasons, the Court finds that the Plaintiff has failed to meet his burden that the Defendant was negligent in conducting the rescue of Bethell, Jr. and judgment must be

entered in favor of Defendant. Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court will enter judgment for Defendant by separate order.

**DONE AND ORDERED** in Miami, Florida, this 14th day of April, 2017.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record